# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan H. Lefkow | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 221 | **DATE** | 11/20/2003 |
| **CASE TITLE** | Joella Smith vs. University of Chicago Hospitals, et al. | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐    Filed motion of [ use listing in "Motion" box above.]

(2) ☐    Brief in support of motion due _____.

(3) ☐    Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐    Ruling/Hearing on _____ set for _____ at _____.

(5) ☐    Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐    Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐    Trial[set for/re-set for] on _____ at _____.

(8) ☐    [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐    This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
     ☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■    [Other docket entry]    Plaintiff's motion for partial summary judgment [17-1] is granted. Defendants' motion for summary judgment [33-1] is granted as to Count I and denied as to Count II. Trial set for 1/20/04 at 10:00 a.m. Final pretrial materials shall be submitted to chambers by 12/19/03. Final pretrial conference is set for 1/9/04 for 4:00 p.m.

(11) ■    [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | **4** | **Document Number** |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | **NOV 2 4 2003** | **60** |
| | Notified counsel by telephone. | | date docketed | |
| | Docketing to mail notices. | | | |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | 11/20/2003 | |
| | | | date mailed notice | |
| **MD** | courtroom deputy's initials | | **MD** | |
| | | | mailing deputy initials | |
| | | Date/time received in central Clerk's Office | | |

DOCKETE

NOV 2 4 2003

| | | |
|---|---|---|
| JOELLA SMITH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 02 C 0221 |
| | ) | Judge Joan H. Lefkow |
| UNIVERSITY OF CHICAGO | ) | |
| HOSPITALS and BRENDA WYMAN, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, JoElla Smith ("Smith"), brings this action against University of Chicago Hospitals ("UCH") and Brenda Wyman ("Wyman") (collectively "defendants"), alleging violations of the substantive (Count I) and anti-retaliation (Count II) provisions of the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, *et seq.* Before the court are Defendants' Motion for Summary Judgment and Smith's Motion for Partial Summary Judgment. Smith moves for partial summary judgment as to the first three elements she must prove in her case: 1) that she was an employee under the FMLA; 2) that defendants are employers under the FMLA; and 3) that Smith was entitled to leave under the FMLA. This court has jurisdiction pursuant to 29 U.S.C. § 2617(a)(2) and 28 U.S.C. § 1331. For the reasons set forth below, the court grants in part and denies in part Defendants' Motion for Summary Judgment and grants Smith's Motion for Partial Summary Judgment.



## SUMMARY JUDGMENT STANDARDS

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). To determine whether any genuine fact exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed. R. Civ. P. 56(c) Advisory Committee's notes. The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323 (1986). In response, the non-moving party cannot rest on bare pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324; *Insolia* v. *Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). A material fact must be outcome determinative under the governing law. *Insolia*, 216 F.3d at 598-99. Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver* v. *Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the court must construe all facts in a light most favorable to the non-moving party as well as view all reasonable inferences in that party's favor. *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## FACTS

### A. Background

Smith has been a licensed radiation therapist since 1981. (Def. L.R. ¶ 8.) Smith was hired by UCH in January of 1981 as a radiation therapist in the Department of Radiation Oncology (the "Department"). (Def. L.R. ¶ 9.) She was promoted to Senior Technologist on or about September, 1983. (Def. L.R. ¶ 10.) In September, 1987, Smith was promoted to Chief Therapist,

also called Supervisor of Radiation Oncology. (Def. L.R. ¶ 14.) Wyman, Technical Director for the Department, was Smith's supervisor as Chief Therapist. (Def. L.R. ¶ 13.)

As of June, 1999, Smith's job duties as Chief Therapist consisted of treating patients with ionized radiation; weekly chart checking for accuracy and completeness; assisting in weekly chart rounds for the medical staff; assisting on the treatment machines; relieving other employees for lunch, vacation, and sick time; filing port films; making sure that doctors signed port films on a daily basis; payroll; supervising staff; and inventory. (Def. L.R. ¶ 22.) "Supervising staff" meant scheduling vacations, hours, start times, and assigning therapists to rotations on treatment machines (which was done with Wyman). (Def. L.R. ¶ 23.)

It is unclear how often Smith treated patients before September, 1999. Wyman testified that

> A fully-functioned chief therapist I'd estimate would spend up to 50% of their time treating or simulating or seeing patients. 25% may be spent on quality improvement. The other 25% may be spent on administrative duties, ordering supplies and dealing with issues, unexpected things that may come up. (Wyman Dep. at 222.)

However, Wyman's deposition testimony suggests that Smith was not a "fully-functioned chief therapist," that is, she spent something less than fifty percent of her time treating patients. (*Id.*) Nevertheless, Smith regularly was involved in direct patient care before September, 1999. (Smith Dep. at 53-54; Def. L.R. ¶ 61.) Wyman states that she has no reason to believe that any patient did not receive high quality patient care from Smith when she administered treatments on a treatment machine. (Pl. St. of Add. Facts ¶ 23.)

## B. Reassignment of Duties

In early 1999, Smith developed symptoms of depression associated with menopause. (Smith Dep. at 19-21.) She was frequently absent from work because of her symptoms. (Smith Dep. at 29-32.) Every time Smith took time off, Wyman would "threaten" her, saying, "we're a very–extremely busy department; everybody is working very hard; I need to be there every day. 'If you want your job, you'll get here. If you don't, there's plenty of people out there who want your job, and I will replace you.'" (Smith Dep. at 29-30.) Around July and August, 1999, Smith's symptoms became increasingly worse. (Smith Dep. at 29-32.) At that time, Smith told Wyman that she needed to take "blocks of time off." (Smith Dep. at 31.) Wyman told Smith that she "needed to be there." (Smith Dep. at 31.) However, Wyman testified that she did not believe that Smith had misused her sick leave. (Wyman Dep. at 173.)

In September, 1999, Wyman removed Smith from direct patient care and from staff supervision. (Pl. St. of Add. Facts. ¶ 73.) Wyman assigned Milton Marshall the duties of supervising the staff that had previously been performed by Smith. (Def. L.R. ¶ 28-29.) No additional duties were given to Smith when Marshall was assigned these duties. (Def. L.R. ¶ 31.) Wyman considered this change in duties to be temporarily effective through the end of the year. (Def. L.R. ¶ 33.) Wyman announced the change in duties at a staff meeting in November, 1999. (Def. L.R. ¶ 29.)

In explaining her decision to change Smith's duties, Wyman told Smith that the job of Chief Therapist had "grown too big for one person." (Smith Dep. at 44.) She explained to the staff that she was splitting up the duties so that "we could work smarter . . . instead of working harder." (Velazquez Dep. at 149-50.) Wyman testified, however, that she changed Smith's

4

duties because of Smith's "unpredictable behavior," irregular attendance, and because the "interpersonal relationships between [Smith] and the therapists were not good." (Def. L.R. ¶ 34; Wyman Dep. at 135, 227.) Wyman explained to Chester Szerlag ("Szerlag"), the Department's Executive Administrator, that it was "important to remove Joella [Smith] from direct patient care and supervision of therapists." (Wyman Aff. at 226.) Szerlag and Wyman "worked as a team," so Szerlag was aware of Wyman's concerns about Smith's attendance and behavior and knew that these were the reasons for the change in Smith's duties. (Wyman Dep. at 227.)

## C. Smith's FMLA Leave

After the staff meeting in November, 1999, at which Wyman announced the change in Smith's duties, Smith asked to go home. Wyman arranged for co-workers to take Smith home, as she looked "physically distressed and not well." (Def. L.R. ¶ 37.) Wyman recommended that Smith see a doctor. (Def. L.R. ¶ 38.) She also recommended that Smith talk to the benefits department of human resources and take FMLA leave. (Def. L.R. ¶ 41-42.)

Smith was off of work at UCH from November 18, 1999 until January 13, 2000. (Def. L.R. ¶ 44.) Smith signed a UCH form called "Family and Medical Leave Application" on December 22, 1999, and submitted it to UCH, requesting FMLA leave from November 20, 1999, until January 5, 2000. (Def. L.R. ¶ 50.) A "Certification of Health Care Provider" form, completed by Dr. Judith Badner and dated December 23, 1999, was submitted to UCH. (Def. L.R. ¶ 51.) Smith signed a UCH form called "Family Medical Leave Act Request" on January 4, 2000. (Def. L.R. ¶ 53.) On January 6, 2000, Dr. Badner submitted another "Certification of Health Care Provider" form, this one in connection with Smith's January 4, 2000, application for FMLA leave, stating that Smith's symptoms had been alleviated with medication. (Def. L.R.

¶ 54-55.) The FMLA Request form signed by Smith on January 4, 2000, was signed by Wyman, as supervisor, on January 21, 2000. (Def. L.R. ¶ 56.) On January 26, 2000, Sonya Davis of UCH signed the January 4, 2000, FMLA Request form, officially designating Smith's time off from November 22, 1999, until January 10, 2000, as FMLA leave. (Def. L.R. ¶ 57.) UCH and Wyman have stated that they have no information that Smith's leave of absence was wrongful. (Def. Ans. to Interrog. 17)

While Smith was on FMLA leave, Wyman made "numerous" comments indicating that she was angry about the fact that Smith was taking FMLA leave. (Def. L.R. ¶ 60.) Wyman stated, for example, that "this family medical leave is too much. This is just too much work. This is bordering on job abandonment. She needs to be here. She needs to do her job. If she wants her job, if she cares about her job, she would be here." (Velazquez Dep. at 31-32.)

## D. Smith's Return to Work

Smith returned to work at UCH on January 13, 2000. (Def. L.R. ¶ 62.) Upon her return, Wyman instructed her to check charts and do chart rounds and payroll, which were part of her duties as Chief Therapist. (Def. L.R. ¶ 64.) However, every time Smith tried to treat patients, Wyman would instruct Smith to perform a different task and have another therapist treat the patient. (Def. L.R. ¶ 67.) Smith testified that Wyman never told her directly that she was not allowed to treat patients, but, according to Smith, Wyman "made it clear she didn't want me to treat patients. She just kept finding things for me to do other than treat." (Smith Dep. at 70.) Wyman, however, testified that she asked Smith "to not participate in direct patient care and to not oversee the staff treating patients. She was free to participate in all other aspects of her job." (Def. L.R. ¶ 68.) Smith never discussed Wyman's prevention of her from treating patients with

6

any of Wyman's superiors or with the employee labor relations department because she was afraid Wyman would fire her if she did. (Def. L.R. ¶ 75-79.)

## E. Smith's Termination

In early 2000, senior management of UCH determined that a multi-million dollar budget shortfall would exist for fiscal years 2000 and onward, and determined that a reduction in force ("RIF") was required.[1] Each of the several Vice Presidents of the Hospital were to make cuts in their respective budgets of approximately 5% of total expenses. (Def. L.R. ¶ 88.) In February, 2000, Kenneth P. Kates ("Kates"), the Vice President responsible for the Department met with Szerlag. Kates instructed Szerlag to recommend positions that could be eliminated. Kates informed Szerlag that the Department of Radiation Oncology was expected to cut personnel costs of approximately $100,000 per fiscal year and that these cuts were not to affect the Department's revenue targets.[2] (Def. L.R. ¶ 83, 89, 91.)

---

[1] Smith denies this statement "based on the fact that it is irrelevant, immaterial and inadmissible having no bearing on any issue in the case and should be stricken." Given that defendants claim that Smith was terminated because of an RIF, the Court finds this statement both material and highly relevant. Since Smith provides no citation to the record to support her denial, the court deems this fact admitted. *See Bordelon* v. *Chicago Sch. Reform Bd. of Trustees*, 233 F.3d 524, 529 (7th Cir. 2000)(A district court is not required to "wade through improper denials and legal arguments in search of a genuinely disputed fact.").

[2] Smith denies that the RIF applied to the Department. As support for her denial, she cites to Velazquez's deposition testimony that Wyman publicly announced that Szerlag had told her that there would be no job cuts in the Department because the Department was "a money making department," and "we wouldn't have to lose any positions." (Pl. Resp. to Def. L.R. ¶ 89-90.) Because Smith is offering this testimony to show that the RIF did not apply to the Department, it is hearsay and will not be considered by the court.

Smith also cites to Milton Marshall's deposition testimony that he knew nothing about an RIF in the Department until Smith was terminated. Smith implies that Marshall would have known about any RIF because he was the "acting Chief of the unit." (Pl. Resp. to Def. L.R. 56.1 ¶ 89-90, 92-93, 95.) However, Marshall's lack of knowledge about an RIF in the Department does not undermine defendants' statement that the RIF applied to the Department. Smith admits that Marshall was not given the position of Chief Therapist until "the time of Ms. Smith's termination." (Pl. St. of Add. Facts ¶ 29.) Furthermore, even if Marshall was "acting" as Chief Therapist, none of the Chief Therapists duties indicate that Marshall should have known about an RIF. (*See* Smith Dep. at 37-42.) Thus, the court accepts that an RIF applied to the Department.

Szerlag then spoke with the work group leaders under him, including Wyman, and told them to think about how to reduce costs without sacrificing quality of care or productivity. (Def. L.R. ¶ 92.)  Wyman testified that the group leaders were to look at "positions and not people in determining where the cut should be made." (Pl. Stat. Add. Facts ¶ 26.)  Szerlag spoke individually to Wyman and suggested that the Chief Therapist position be eliminated because he believed that it was not involved in direct patient care and that its elimination would not impact revenue. (Def. L.R. ¶ 95.)  His understanding of the Chief Therapist's duties was based on information received from Wyman as well as personal observation and experience as Executive Administrator of the Department. (Def. L.R. ¶ 110.)

Wyman's initial response was that no therapist position, including Chief Therapist, could be cut. (Def. L.R. ¶ 96.)  However, Szerlag and Wyman eventually determined that the position of Chief Therapist could be eliminated without sacrificing patient care or revenue. (Def. L.R. ¶ 108.)  Wyman testified that the Chief Therapist position could be eliminated because it was "never defined to be assigned to a treatment machine or to perform patient care full time." (Def. L.R. ¶ 112.)  Similarly, Szerlag testified that the decision to eliminate the Chief Therapist position was based on his belief that the Chief Therapist position was "more supervisory in nature than providing direct patient care." (Def. L.R. ¶ 108.)  Again, Szerlag's information about the Chief Therapist's duties was based on information he received from Wyman as well as personal observation and his experience as Executive Administrator of the Department. (Def. L.R. ¶ 110.)

On June 5, 2000, UCH terminated Smith's employment. (Def. L.R. ¶ 130.)  Wyman told Smith that the position of Chief Therapist was being eliminated due to financial and operational

difficulties. (Def. L.R. ¶ 131.) Ketonya Velazquez testified that shortly after Smith was terminated, Marshall announced at a meeting that he was the new Chief Therapist. (Pl. Stat. of Add. Facts ¶ 30.) In the 2001-2002 University of Chicago Directory, Marshall was listed as the Chief Radiation Therapist ("Chief RTT") (Pl. Stat. of Add. Facts ¶ 31.) In the 1999-2000 Directory, Smith was listed as the "Chief RTT." (Pl. Stat. of Add. Facts ¶ 32.)

## DISCUSSION

Congress enacted the FMLA in part "to entitle employees to take reasonable leave for medical purposes." 29 U.S.C. § 2601(b)(2). The FMLA establishes two categories of broad protections for employees who need to take such leave. First, the FMLA grants eligible employees certain substantive statutory rights. *See King* v. *Preferred Technical Group*, 166 F.3d 887 891 (7th Cir. 1999). The FMLA provides eligible employees of a covered employer the right to take unpaid leave of up to twelve work weeks in any twelve-month period for a "serious health condition" as defined by the FMLA. *Id.*; *see* 29 U.S.C. § 2612(a)(1). After the period of qualified leave expires, the employee is entitled to be reinstated to the "position of employment held when the leave commenced" or "an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment." *Id.*; *see* 29 U.S.C. § 2614(a). To insure the availability of these guarantees, the FMLA declares it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided." *Id.*; *see* 29 U.S.C. § 2615(a)(1).

In addition to the substantive guarantees, the FMLA also affords employees protection in the event they are discriminated or retaliated against for exercising their rights under the Act. *Id.*; *see* 29 U.S.C. § 2615(a)(1) & (2). Specifically, "an employer is prohibited from discriminating

9

against employees . . . who have used FMLA leave." *Id.(quoting* 29 C.F.R. § 825.220(c)). An employer may not consider the taking of FMLA leave as a negative factor in employment actions. *Id.*

Smith alleges that defendants deprived her of her substantive statutory rights under the FMLA by not returning her to the position she held prior to taking FMLA leave or to an equivalent position. Smith also alleges that defendants retaliated against her for exercising her rights under the FMLA by terminating her because she took FMLA leave. Defendants contend that Smith was returned to a position equivalent to her pre-leave position and that Smith was terminated in an RIF and not in retaliation for exercising her rights under the FMLA.

## I. Common Elements of Smith's Substantive and Retaliation Claims

To prevail on either her substantive or her retaliation claim, Smith first must prove (1) that she was an eligible employee under the FMLA, 29 U.S.C. § 2611(2); (2) that defendants were employers covered by the FMLA, 29 U.S.C. § 2611(4); and (3) that she was entitled to leave under the FMLA, 29 U.S.C. § 2612(a)(1). *See Dey* v. *L. Marshall Roofing and Sheet Metal*, No. 01-C-9810, 2000 WL 773989, at *2 (N.D. Ill. April 29, 2002).

Smith argues that she is entitled to summary judgment on these three elements of her claims. Defendants admit that Smith was an eligible employee under the FMLA. UCH also admits that it was an employer covered by the FMLA. Wyman argues, however, that she was not Smith's "employer" under the FMLA and thus is entitled to summary judgment as to Smith's complaint in its entirety. Defendants also argue, for reasons discussed below, that summary judgment on the third element of Smith's claim is inappropriate at this time.

10

## A. Whether Wyman was Smith's "Employer" Under the FMLA

Wyman contends that she is entitled to summary judgment because she, as an individual, cannot be held liable as an "employer" under the FMLA. The FMLA defines an employer as "any person engaged in commerce or in any industry or activity affecting commerce who employs 50 or more employees for each working day . . .includ[ing] any person who acts, directly or indirectly, in the interest of an employer to any of the employees of such an employer. . . ." 29 U.S.C. § 2611(4)(A)(i) & (ii).

Neither the Supreme Court nor the Seventh Circuit has addressed whether individuals can be held liable as "employers" under the FMLA. However, other judges in this district have consistently held that individuals can be held liable under the Act. *Evans* v. *Henderson*, 2000 WL 1161075 (N.D. Ill. 2000)(Conlon, J.); *Llante* v. *Am. NTN Bearing Mfg. Corp.*, 1999 WL 1045219 (N.D. Ill. 1999)(Norgle, J.); *Divizio* v. *Elmwood Care, Inc.*, 1998 WL 292982 (N.D. Ill. 1998)(Kocoras, J.); *Beyer* v. *Elkay Mfg. Co.*, 1997 WL 587487 (N.D. 1997)(Reinhard, J.); *Freemon* v. *Foley*, 911 F. Supp. 326 (N.D. Ill. 1995)(Aspen, C.J.). The primary rationale for this holding has been that the FMLA "tracks word for word the definition [of employer] used in the Fair Labor Standards Act ("FLSA")," 29 U.S.C. § 203(d), which does subject individuals to liability. *Freemon*, 911 F. Supp. at 330-31; *see Evans*, 2000 WL 1161075 at *3; *Llante*, 1999 WL 1045219 at *5.

Defendants argue that the court should not rely on the meaning of employer under the FLSA when interpreting the FMLA. While recognizing that the definitions of employer in the two statutes use identical language, they point out that there is an important difference in the two statutes. The FLSA applies to all employers, no matter the size, while the FMLA only applies to

11

employers with fifty or more employees within a seventy-five mile radius. Defendants argue that "it would be non-sensical for Congress to limit liability to larger employers while at the same time imposing liability on individuals. . . . In light of the size limitations written into the FMLA, individual liability would seem to be an absurd result."

This court fails to see how this result is "absurd" or "non-sensical." Congress' decision to exempt smaller employers from the FMLA's coverage apparently was motivated by a desire to shield smaller employers from the costs of providing mandated family and medical leave. *See, e.g.*, S. Rep. No. 103-3, pt. IX, at 49 (1993)(Minority views of senators expressing concern that the FMLA "will burden employers, especially smaller and medium-sized businesses, with the costs of mandated leave regardless of their ability to absorb such costs."). However, individuals "who act[], directly or indirectly, in the interest of an employer" are not burdened by the costs of providing family and medical leave. Thus, there is no reason to conclude that Congress intended to exempt such individuals from the FMLA's coverage.

This court finds no reason to depart from the view that the FMLA, like the FLSA, allows for individual liability "provided the defendant had supervisory authority over the complaining employee and was responsible in whole or in part for the alleged violation." *Riordan* v. *Kempers*, 831 F.2d 690, 694 (7th Cir. 1987)(interpreting the definition of employer under the FLSA). It is undisputed that Wyman was Smith's supervisor during the period in question. Thus, Wyman falls within the FMLA's definition of "employer" and may be held liable if Smith produces evidence to show that Wyman "was responsible in whole or in part for the alleged violation."

12

## B. Whether Smith was Entitled to Leave Under the FMLA

Defendants admit that UCH obtained medical certification of Smith's health condition pursuant to the procedures specified in the FMLA, 29 U.S.C. § 2613(a), and officially designated Smith's leave of absence as FMLA leave for a serious health condition. Defendants also admit that they have no knowledge that Smith's leave of absence was wrongful. Based on these admissions, on September 26, 2002, Smith moved for a protective order to prevent discovery of her confidential communications with her licensed psychotherapists, physicians, counselors, social workers, and other licensed health care practitioners. Smith argued that any further inquiry into her confidential medical records would be improper under section 2613 of the FMLA, which provides the procedures for an employer to contest the validity of an employee's claim to a serious health condition. Smith also argued that discovery of her confidential communications with health care providers would violate her physician-patient privilege. On October 22, 2002, this court granted Smith's motion for a protective order. *See* Minute Order of October 22, 2002.

Smith now moves for summary judgment that she was entitled to leave under the FMLA. Again, she points out that she provided UCH with proper medical certification of her condition, that UCH officially designated her leave of absence as FMLA leave, and that defendants admit they have no knowledge that Smith's leave was improper. Defendants argue that UCH's failure to utilize the section 2613 procedures and its designation of Smith's leave as FMLA leave should not foreclose defendants from now having the opportunity to prove that Smith was not entitled FMLA leave. Furthermore, defendants point out that they have no information that Smith's leave of absence was improper because the protective order prevented them from discovering such information. Thus, defendants ask the court to deny summary judgment on this element of

13

Smith's claim or to allow discovery of Smith's medical records so that defendants can ascertain if defenses exist to Smith's claimed entitlement to FMLA leave.

The FMLA provides employers with a procedure for contesting whether an employee is entitled to FMLA leave for a "serious health condition." Under section 2613(a) of the FMLA, an employer may require that an employee's request for FMLA leave "be supported by a certification issued by a health care provider of the employee." An employee's medical certification "shall be sufficient" if it states

(1) the date on which the serious health condition commenced;
(2) the probable duration of the condition;
(3) the appropriate medical facts within the knowledge of the health care provider regarding the condition;
[]
(4)(B) . . . a statement that the employee is unable to perform the functions of the position of the employee.

29 U.S.C. § 2613(b).

If an employer questions the validity of the medical certification submitted by the employee, it may require the employee to obtain the opinion of a second health care provider designated and approved by the employer. 29 U.S.C. § 2613(c)(1). If the second opinion differs from the opinion of the original certification, the employer may require the employee to obtain the opinion of a third health care provider designated or approved jointly by the employer and the employee. 29 U.S.C. § 2613(d)(1). The opinion of the third health care provider "shall be considered binding on the employer and the employee." 29 U.S.C. § 2613(d)(2).

The issue before the court is whether an employer that chooses not to utilize this procedure for contesting an employee's entitlement to FMLA leave for a serious health condition may later challenge the employee's entitlement to the leave in a civil action. The structure and

14

internal logic of section 2613 of the FMLA suggest that the certification procedures provided are the exclusive means for an employer to challenge the validity of an employees medical certification. Although the FMLA regulations explicitly permit an employer to deny leave to an employee who does not produce medical certification, 29 C.F.R. § 825.312(b), there is no explicit authority for an employer to deny leave to an employee who does produce medical certification. To the contrary, Congress stated that if an employee's medical certification meets certain requirements, it "shall be sufficient." 29 U.S.C. § 2613(b). The FMLA regulations add further that "the employer may not request additional information from the employee's health care provider." 29 C.F.R. § 825.307(a). If an employer has the choice of skipping the certification process and instead engaging in discovery of an employee's medical records after the employee files a civil action under the FMLA, the term 'sufficient' and the provisions to protect the privacy of the employee's medical history are rendered meaningless. *See Sims* v. *Alameda-Contra Costa Transit District*, 2 F. Supp. 2d 1253, 1262-63 (N.D. Cal. 1998).

Furthermore, the regulations provide that if an employer does seek a second (or third) medical opinion, "the employee is provisionally entitled to the benefits of the Act" while the process is being pursued. 29 C.F.R. § 825.307(a)(2). This implies that the employee's submission of a complete medical certification is sufficient to trigger FMLA protection unless and until there is contrary medical evidence. The provision suggests that the second and third medical opinion process is the exclusive verification option for an employer that has reason to doubt the validity of an employee's medical certification. *Sims*, 2 F. Supp. 2d at 1262.

Moreover, the opinion of the third health care provider "shall be considered to be final and shall be binding on the employer and employee." 29 U.S.C. § 2613(d)(2). This final and

binding procedure ensures a speedy determination of an employee's need for medical leave where the employer has reason to question the validity of the initial certification.

Defendants argue that not allowing discovery of Smith's medical records to determine if she was entitled to FMLA leave "would prevent employers from acting on information received after a designation of FMLA leave was made, including evidence of fraud . . . The impact on employers will be a chilling in their willingness to designate leave as FMLA without utilizing the protections of FMLA allowing second and third opinions." The court need not decide if evidence of fraud would allow an employer to discover an employee's medical history after a designation of leave as FMLA, because defendants have no evidence of fraud, and they should not be allowed to rummage through Smith's medical records in the hope of finding such evidence. Furthermore, an employer that requires an employee to seek a second or third opinion must do so "at the expense of the employer." 29 U.S.C. 2613(c)(1) & (d)(1). The additional expense to the employer is a sufficient counter to any possible "chilling effect."

This court finds that an employer that chooses not to utilize the second and third opinion procedure for contesting an employee's entitlement to FMLA leave for a serious health condition may not later seek discovery of an employee's medical records to challenge the employee's entitlement to the leave in a civil action. On December 23, 1999, Smith provided UCH with a "Certification of Health Care Provider" completed and signed by Dr. Judith Badner. That certification was "sufficient" under the standards of 29 U.S.C. § 2613(b).[3] UCH did not require

---

[3]The "Certification of Health Care Provider" completed by Badner was a UCH form document that essentially recites the statutory elements for sufficient certification.

Smith to seek a second or third opinion. Instead, it designated Smith's leave of absence as FMLA leave. Thus, this court finds that, as a matter of law, Smith was entitled to FMLA leave.

## II. Smith's Substantive Claim

Smith claims that defendants violated her substantive rights under the FMLA by not returning her to her pre-leave position or an equivalent position after she returned from FMLA leave. Defendants argue that when Smith returned from FMLA leave, she was given the same duties she had in September, 1999. Defendants further argue that any changes in Smith's duties after she returned from leave were *de minimis* changes. Thus, they contend that they are entitled to summary judgment on Smith's substantive claim.

The FMLA provides that an employee that takes FMLA leave "shall be entitled, on return from such leave–(A) to be restored . . . to the position of employment held by the employee *when the leave commenced . . .*" 29 U.S.C. § 2613(a)(1)(A)(emphasis added). It is undisputed that in September, 1999, one month before Smith began her FMLA leave, Wyman removed Smith from direct patient care and staff supervision with the understanding that the change in duties was to be temporary. When Smith returned from FMLA leave, she was not allowed to treat patients nor was she given any staff supervisory duties. Thus, according to the plain language of the FMLA, Smith was returned to the position she held "when the leave commenced."

Smith suggests that, because Wyman admits that she intended the change in Smith's duties in September, 1999, to be temporary, Wyman should have restored Smith's pre-September, 1999, duties when Smith returned from leave. However, if Wyman decided not to restore Smith's pre-September, 1999, duties because Smith took FMLA leave, then Smith's

17

claim is properly understood as a retaliation claim, not a substantive claim. Thus, the court finds that summary judgment for defendants is proper on Smith's substantive claim.

## III. Smith's Retaliation Claim

Smith claims that defendants terminated her on June 5, 2000, in retaliation for taking valid FMLA leave.[4] Defendants claim that Smith's position was eliminated as part of a legitimate RIF. When a plaintiff alleges a retaliatory discharge under the FMLA, the plaintiff must establish that the employer engaged in intentional discrimination. *King*, 166 F.3d at 892. As in other retaliatory discharge cases, a plaintiff alleging retaliatory discharge under the FMLA may establish that an employer engaged in intentional discrimination through direct or indirect evidence. *Id.* Smith alleges that there is both direct and indirect evidence that defendants retaliated against her for exercising her rights under the FMLA.

### A. Direct Evidence of Retaliation

While Smith was on FMLA leave, Wyman stated that "this family medical leave is too much. This is just too much work. This is bordering on job abandonment. [Smith] needs to be here. She needs to do her job. If she wants her job, if she cares about her job, she would be here." Velazquez testified that Wyman made "numerous" similar comments while Smith was on leave. Defendants offer two arguments as to why Wyman's statements do not constitute direct evidence of FMLA discrimination. First, defendants argue that Wyman's comments are not

---

[4]In her Response to Defendants' Motion for Summary Judgment, Smith also claims that Wyman removed her patient treatment and staff supervisory duties in September, 1999, as retaliation for *requesting* FMLA leave. Smith did not plead this alleged adverse job action in her original complaint and has not amended her complaint to add this additional basis of liability. Thus, the court does not consider this claim.

direct evidence of retaliation because they occurred over four months before Smith was terminated. Second, defendants argue that Wyman was not the principal decision maker in the decision to terminate Smith. Thus, even if Wyman's comments reveal discriminatory animus, there is no causal link between that animus and the decision to terminate Smith.

The Seventh Circuit has held,

> It would cripple enforcement of the employment discrimination laws to insist that direct evidence take the form of an employer's statement "I'm firing you because you are in a protected group." Evidence of discriminatory motives must, it is true, have some relationship with the employment decision in question. Inappropriate but isolated comments that amount to no more than "stray remarks" in the workplace will not do. However, "remarks and other evidence that reflect a propensity by the decisionmaker to evaluate employees based on illegal criteria will suffice as direct evidence of discrimination," even short of an admission of illegal motivation.

*Sheehan* v. *Donlen Corp.*, 173 F.3d 1039, 1044 (7th Cir. 1999)(internal citations omitted). Wyman's comment is remarkably close to the kind of direct admission of a discriminatory motive that the Seventh Circuit thought unlikely in employment discrimination cases.

To constitute direct evidence of discrimination, however, discriminatory comments must be "contemporaneous with the discharge *or* causally related to the discharge decision making process." *Geier* v. *Medtronic, Inc.*, 99 F.3d 238, 242 (7th Cir. 1996)(emphasis added). Defendants are correct that a long period of time between a discriminatory comment and an adverse employment action can defeat the inference of a causal relationship between them. *Id.* However, there is no "statute of limitations" governing the amount of time it takes to defeat the inference of a causal relationship. The time period will differ according to the nature of the remark and the context in which it was made. An isolated comment made only days before an adverse employment action may not rise to the level of direct evidence, while a clear statement of

discriminatory intent may suffice as direct evidence even if it was made well before the adverse action. The question is whether the statement is "evidence that someone with managerial authority was animated by illegal employment criteria." *Venter* v. *City of Delphi*, 123 F.3d 956, 972 (7th Cir. 1997). A reasonable jury could find that Wyman's comment, even though it occurred over four months before Smith's termination, is direct evidence that she was "animated by illegal employment criteria."

However, unless Wyman played a role in the decision to terminate Smith, evidence of her discriminatory animus is irrelevant. Defendants argue that Szerlag, not Wyman, made the decision to eliminate the Chief Therapist position. In an employment discrimination case, "Summary judgment generally is improper where the plaintiff can show that an employee with discriminatory animus provided factual information or other input that may have affected the adverse decision." *Carter* v. *Enterprise Rent-a-Car*, No. 01 CV 4494, 2002 WL 1759821, at *4 (N.D. Ill. July 29, 2002)(*citing Shager* v. *Upjohn Co.*, 913 F.2d 398, 405 (7th Cir. 1990). Wyman testified that she and Szerlag "worked as a team." Szerlag testified that he *and Wyman* believed the Chief Therapist position could be eliminated without sacrificing revenue and patient care. Szerlag also stated that his understanding of the duties of the Chief Therapist "was based on information received from Brenda Wyman, as well as personal observation, and his experience as Executive Administrator of the Department." Given these facts, a reasonable jury could find that Wyman's discriminatory animus "tainted" the decision to terminate Smith.

## B. Indirect Evidence of Retaliation

As in other retaliatory discharge cases, Smith can establish indirect evidence of retaliatory discharge under the FMLA through an adaptation of the burden-shifting test established by

*McDonnell Douglas Corp.* v. *Green*, 411 U.S. 792 (1973). *Brown* v. *Chicago Sun-Times, Inc.*, No. 00 C 6728, 2002 WL 31844984 (N.D. Ill. Dec. 17, 2002)(*citing Stone* v. *City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640 (7th Cir. 2002). Under this method, a plaintiff must show (1) that she engaged in a statutorily protected activity; (2) she was subjected to an adverse employment action; (3) she was performing her job in a satisfactory manner; and (4) she was treated less favorably than any other similarly situated employee who did not engage in such protected activity. *Id.* If the plaintiff establishes a *prima facie* case of retaliation in this manner, the burden then shifts to the defendant to articulate a legitimate non-discriminatory reason for the adverse employment action. "If the defendant presents unrebutted evidence of a noninvidious reason for the adverse action, [it] is entitled to summary judgment. Otherwise, there must be a trial." *Id.* (*quoting Stone* v. *City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002). Under this method, establishing a causal link between the protected expression and adverse employment action is not required. *Id.*

Defendants do not dispute that Smith has established a *prima facie* case. Thus, the burden shifts to defendants to articulate a legitimate, non-discriminatory reason for Smith's termination. At this stage in the analysis, "the [employer] need not persuade the court that it was actually motivated by the proffered reasons." *Texas Dept. of Community Affairs* v. *Burdine*, 450 U.S. 248, 254 (1981). It must only raise a genuine issue of material fact as to whether it discriminated against the plaintiff. Defendants contend that the position of Chief Therapist, which Smith held, was eliminated in an RIF because the position did not involve direct patient care and its elimination would not impact revenue. This explanation is both reasonable and non-discriminatory. Thus, defendants have satisfied their burden of production.

Once a defendant has rebutted a plaintiff's *prima facie* case, the plaintiff bears the burden of persuasion to demonstrate that the employer's stated reasons were false and that discrimination was the real reason behind the adverse employment decision as issue. In an RIF case, a plaintiff can show pretext either by establishing that the RIF itself was pretextual or by showing that the employer's reasons for including the plaintiff in the RIF were pretextual. *Paluck* v. *Gooding Rubber Co.*, 221 F.3d 1003, 1014 (7th Cir. 2000). Smith has not raised a genuine issue of material fact regarding the existence of a legitimate RIF at UCH. However, Smith has presented several facts that call into question defendants' proffered reasons for including Smith in the RIF. First, defendants claim that the *position* of Chief Therapist was eliminated because it did not involve patient care. However, Wyman stated that

> A fully-functioned chief therapist I'd estimate would spend up to 50% of their time treating or simulating or seeing patients. 25% may be spent on quality improvement. The other 25% may be spent on administrative duties, ordering supplies and dealing with issues, unexpected things that may come up.

Wyman's statement directly contradicts defendants' proffered reasons for eliminating the position. Furthermore, Velazquez testified that shortly after Smith was terminated, Marshall announced at a meeting that he was the new Chief Therapist. The next year, Marshall was listed as the Chief Radiation Therapist ("Chief RTT") in the University of Chicago directory. These facts directly contradict defendants' assertion that the position of Chief Therapist was eliminated. "Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it can be quite persuasive." *Reeves* v. *Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147 (2000). The rejection of a defendant's proffered reasons for an adverse employment action "will permit a trier

of fact to infer the ultimate fact of intentional discrimination, and . . . no additional proof of discrimination is required." *Perdomo* v. *Browner*, 67 F.3d 140, 145 (7th Cir. 1995). Thus, the court finds that a reasonable trier of fact could find that defendants retaliated against Smith for taking FMLA leave.

## ORDER

For the reasons stated above, Smith's Motion for Partial Summary Judgment is granted (#17). Defendants' Motion for Summary Judgment is granted as to Count I and denied as to Count II (#33). Trial is set for January 20, 2004. Final pretrial materials shall be submitted to chambers not later than December 19, 2003. In the meantime, the parties will be referred to the designated magistrate judge for a settlement conference. A final pretrial hearing is set for January 9, 2004.

Enter: _____

JOAN HUMPHREY LEFKOW

Date: November 20, 2003                    United States District Judge